UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| FRED BATTAH, MICHAEL BATTAH, AND SHALIMAR MAAKAR, INDIVIDUALS<br><br>Plaintiffs,<br><br>vs.<br><br>SERGIO PADRON, AN INDIVIDUAL,<br><br>Defendant. | Case No.: 5:20-cv-1440<br><br>JURY TRIAL REQUESTED |

## ORIGINAL COMPLAINT

NOW COME the Plaintiffs, Fred Battah, Michael Battah, and Shalimar Maakar (collectively, "Plaintiffs"), and for their complaint against Sergio Padron ("Padron"), state as follows:

### THE PARTIES

1. Plaintiff Fred Battah is an individual residing in Bexar County, Texas.

2. Plaintiff Michael Battah is an individual residing in Bexar County, Texas.

3. Plaintiff Shalimar Maakar is an individual residing in Bexar County, Texas.

4. On information and belief, Defendant Sergio Padron is an individual residing in Miami, FL.

### JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as each Plaintiff is a citizen of Texas, and Defendant is a citizen of Florida, and the amount in controversy exceeds $75,000.

6. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district, and because the Defendant maintained sufficient contacts with this Venue for general and specific jurisdiction alike.

## OVERVIEW

7. Plaintiff, Fred Battah ("Battah"), is a businessman and investor who has developed several successful companies over the years in a variety of industries including pharmacy, dental, beauty, and grocery.

8. Prior to Plaintiffs' investment in "Derma Dash" (explained in more detail below), Defendant Padron proposed an online telehealth platform to Battah, the same to be called "Derma Dash."

9. Padron's proposals and associated representations, on which Plaintiffs relied, induced Plaintiffs to invest in the proposed venture by way of monetary contributions to the entity through which the business concept was to be implemented - Derma Dash, LLC, a Delaware LLC with its registered, principle offices in this Judicial District and Division.

10. Padron represented that he would, and upon Plaintiffs' investment, committed to develop and manage the Derma Dash telehealth business, and was accordingly appointed a "Manager" of Derma Dash, LLC.

11. Over the ensuing months, Padron's development of the Derma Dash platform was illusory, and Padron's expenditures of company funds was other than in the legitimate furtherance of the business and welfare of Derma Dash, LLC.

12. Worse still, and in furtherance of his fraudulent acts and representations, and wanton breach of his fiduciary and contractual duties as Manager of Derma Dash, LLC, Padron used at least some company funds to as represented, and that the entire project was, essentially, a sham to

steal money and divert funds to the development of other business ventures, at least one of which is a direct competitor of Derma Dash.

## FACTUAL ALLEGATIONS

13. Prior to June of 2019, Padron presented Battah with an investment opportunity.

14. Padron told Battah that Padron had been working on developing a platform for telehealth services, and that he was seeking investment to launch the concept, which Padron called "Derma Dash" (reflecting the initial focus as being in the dermatological field).

15. As Padron courted Battah's investment, he provided Battah with glossy logo samples and other literature regarding the branding concept for Derma Dash.

16. Padron also emphasized the significant progress he had already made and the overall feasibility of the Derma Dash model, which involved a user (patient) entering the platform, and being directed to a telehealth consult with a licensed dermatologist. Following the consult, the dermatologist would submit a prescription (e.g. for topical skin cream) to a pharmacy which would, in turn, fill and ship the prescription directly to the user's home address.

17. Padron and Battah's conversations spanned several months, during which time Padron represented that he was well on his way in the development of the Derma Dash platform; explained how lucrative the business model would be; and indicated that he expected the platform to be completed and ready to go "live" in approximately 3 months.

18. Battah relied on Padron's representations and decided to invest in what he believed, based on such representations, to be a soon-to-be-launched and largely vetted platform.

19. In furtherance of this business plan, Padron and Battah became co-managers of Derma Dash LLC. A true and accurate copy of the Limited Liability Company Agreement of Derma Dash LLC (the "Operating Agreement,") dated June 26, 2019, is attached hereto as **Exhibit 1.**

20. Battah's family members, Michael Battah and Shalimar Maakar, Plaintiffs herein (collectively, the "co-investors" or "Plaintiffs"), were also impressed by Padron's plans.

21. Battah's co-investors became Members of Derma Dash LLC, and the three of them, including Battah, made a collective initial capital contribution of $118,000. In exchange, each received a 16.667% membership interest in the company. (*See* **Exhibit 1 at Exhibit A**).

22. For his part, and based upon his representation that he had already completed significant development, and would soon conclude development of the Derma Dash platform, Padron's initial capital contribution was $10 in exchange for a 50% membership interest in the company. (*See* **Exhibit 1 at Exhibit A**).

23. Following execution of the Operating Agreement, Patron not only failed to meet projected milestones, but repeatedly asked for more funding - purportedly needed to complete work on the Derma Dash platform and otherwise launch Derma Dash operations.

24. To promote the investment, and in good faith reliance upon Padron's representations that the project was advancing, but simply needed more capital, Battah wired Padron the following amounts over the months of September-December of 2019:

   a. $80,245 on September 17, 2019

   b. $47,000 on October 11, 2019

   c. $22,415 on October 29, 2019

   d. $24,953 on November 19, 2019

   e. $20,000 on December 13, 2019

25. In a budget spreadsheet Padron provided to Battah, the additional, near-$200,000 dollars of capital were promised to be spent on things like a web developer ($17,000), a CRM (customer

relationship management) developer ($20,000), and miscellaneous other online services (approximately $5,000).

26. Padron's budget documentation for this four-month span also contemplated what appeared to be a robust office staff. For example, and on top of the near-$10,000 Padron earmarked for rent, Padron identified the salaries of an officer manager ($12,000), a pre-authorization manager ($10,950), a customer service manager ($9,660), a customer service representative ($6,240), a social media manager ($6,240) and a programmer ($8,400).

27. He earmarked $24,000 of travel expenses for himself, and hired two law firms to provide legal consultation on regulatory issues related to the telehealth platform (to the budgeted tune of $15,000).

28. Through the above representations and undertakings, Plaintiffs were lulled into believing that their investment was legitimate and that the business was moving forward in a reasonable and positive manner.

29. Throughout August and September of 2019, Battah and his associates requested access to various back-end components of the underdeveloped platform in order to run a test of the system.

30. Padron responded by granting either partial access or explanations that certain access was somehow impossible. For example, on September 17, 2019, in response to Battah's request for access to do a test run, Padron wrote:

> "Hey Fred, Giving access to the front end of the system is fine, just cannot be touched as it's in a continuous build out phase. You can run thru a patient intake at media.dermadash.com and see functionality work all the way thru and go back to CRM and login and see the functionality, for the Patient Eligibility and also the Patient Coverage. Now the Class G [pharmacy] will be given access to conduct and operate customer service from the back end and manage 100% of that side of the business. We are almost done with the telemedicine platform, so we can have a simple, user friendly tool for the doctors to work on from the onset. That tool should be and will be operational by next week, as it's being worked on as we speak. My biggest concern is the pharmacy network, or let alone getting started with a handful of them. That is

something that should have been in the works for the last few weeks and if not, let's discuss what is needed to be done in order to get a plan of action in place for that."

31. In November 2019, Padron represented that he was on the cusp of a long-promised "soft launch." On November 3, 2019, he wrote to Battah, "We look to hopefully start a soft launch next Monday…it's time!"

32. No soft launch occurred on the promised date (nor hence).

33. Near the end of November 2019, Battah reached out to Padron to obtain more information on how Padron was planning to handle HIPAA compliance issues. Again, Padron responded in a confusing, round-about manner:

> "Hey Fred. I'm the one putting this together. It's pretty straight forward, the guidelines for HIPPA [sic] work to protect the patient interest, that is done so thru the platform, which sits in a secure environment on it's [sic] own AWS. For the tools being used in the system, it's tied to Sfax which is HIPPA [sic] compliant and also, ties to Citrix Sharefolder if need be, but right now it's set for Sfax routing. On the aspect of telemedicine laws, all state laws are different, it is not our responsibility to determine how a doctor conducts or will conduct his work practice…Outside that, I will be selling this to another company soon and will help them guide this, these tools are very simple and doctors as stated work under an agreement for a paid for fee service. As we have spoken we will need to bring a Medical Director that is a dermatologist to over see and help give foundation to our project."

34. As time passed, and promised milestones deadlines passed unfulfilled, Battah became increasingly concerned with the progress of the platform, Battah instructed his business associate, Jody Welchans ("Welchans"), a licensed pharmacist who was to serve as an administrator overseeing the pharmacy component of Derma Dash, to fly to Miami in January 2020 to meet face-to-face with Padron.

35. Padron repeatedly failed to respond to Welchans' phone calls and/or responded "call you back" with no follow-up.

36. When Welchans and Padron did communicate, Welchans was provided only vague reports of "progress" and related activities.

37. At and following Welchans' trip to Miami, Padron repeated representations directly, and indirectly to Battah that the platform was on the cusp of success, but such representations were accompanied by request for still further funding.

38. Battah and the co-investors relied on these representations in providing, by wire transfer, the further capital infusions to Derma Dash, LLC as follows:

   a. $20,000 on January 9, 2020

   b. $40,000 on January 31, 2020

   c. $41,085 on February 28, 2020

   d. $11,000 on March 27, 2020

39. Battah also obtained, at significant expense, additional legal counsel to discuss the mechanism of serving patients and in order to ensure the online framework complied with the patchwork of applicable state and federal laws and regulations.

40. Battah's counsel attempted to discuss the parameters of the telehealth system with Padron, but Padron refused to engage in any productive or meaningful discussions.

41. At the beginning of March 2020, Battah again dispatched Welchans to Miami to have a face-to-face with Padron. Padron was again evasive and non-communicative, and the trip was likewise as fruitless as the first.

42. Near the end of March 2020, Battah learned that the Derma Dash website had "gone live" without his knowledge.

43. The platform that went live was inconsistent with the operability, interface style, and content that had been represented by Padron to Battah.

44. Soon thereafter, Battah became aware that while Padron was supposedly building out the Derma Dash platform, he was, instead, focused on at least two other competitive telehealth platforms whose development and launch coincided with the projected timeline for Derma Dash.

45. The first is "MD2Rx" (https://md2rx.com/), a class G Pharmacy and dermatology telemedicine platform that connects with patients and invites physicians to "Join our Dermatologist Network".

46. The Terms of Service on MD2Rx.com are identical to those of Derma Dash.

47. MD2Rx's licensure page on The Texas Board of Pharmacy website identifies Renee Dougalas as the Pharmacist in Charge ("PIC"). Padron had previously tapped Dougalas to serve as a "consultant" for Derma Dash.

48. MD2Rx's licensure page also reveals Rossana Rodriguez Vilar as an officer. Upon information and belief, Ms. Vilar is a friend of Padron's from Miami.

49. A lookup of MD2Rx's National Provider Identification profile also shows Ms. Vilar as the responsible party, but includes Padron's phone number. (https://mdnpi.com/providers/md2rx-llc/npi-1992338438.html).

50. Apparently no longer interested in downplaying his role with MD2Rx, Padron has listed the company as his current employer on LinkedIn. A true and accurate copy of Padron's LinkedIn profile (last accessed on June 15, 2020 at https://www.linkedin.com/in/spadron/) is attached hereto as Exhibit 2.

51. Beyond MD2Rx, Battah discovered Padron had yet another competitive side project which he pursued in lieu of diligently working on Derma Dash – an erectile dysfunction telehealth platform called "Chubby's" or "My Chubby's". Padron describes himself as the Co-Founder of Chubby's since October 2019. (See Ex. 2).

52. Chubby's claims to provide "Lifestyle Prescription Meds Online" from "US-licensed Physicians," and promises "Personalized Treatment" and "Fast, Free, & Discreet Delivery." (https://www.instagram.com/mychubbys/) (last accessed June 15, 2020).

53. Upon information and belief, Padron was developing both MD2Rx and Chubby's while at the same time representing that he was advancing the Derma Dash project and requesting (and receiving) more and more funds from Battah.

54. Upon information and belief, the initial capital contribution of Battah and the co-investors were used by Padron to either directly advance MD2Rx and/or Chubby's, or to develop Confidential Information that Padron later exploited for the benefit of MD2Rx and/or Chubby's. (See Exhibit 1 ¶ 11.8 ("Confidential Information")).

55. Upon information and belief, the ongoing capital infusions provided by Battah, spanning August 2019 through March of 2020, were used by Padron to either directly advance MD2Rx and/or Chubby's, or to develop Confidential Information that Padron later exploited for the benefit of MD2Rx and/or Chubby's.

56. Derma Dash is a complete failure-to-launch, as a result of Padron's deceit, evasiveness, and pursuit of competitive and other telehealth platforms.

57. Padron has "gone dark," has failed to respond to any of Battah's recent communications, and retains all critical information regarding back-end access to the Derma Dash platform.

**COUNT I – BREACH OF FIDUCIARY DUTY**

58. Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

59. As a Manager of Derma Dash LLC, Padron owed Plaintiffs a fiduciary duty of care.

60. As a Manager of Derma Dash LLC, Padron owed Plaintiffs a fiduciary duty of loyalty.

61. Padron breached his fiduciary duty of care when he knowingly and utterly failed to manage the development of the Derma Dash platform, without which Derma Dash LLC could be little more than an inoperative shell.

62. Padron breached his fiduciary duty of care when he failed to make reasonable effort to launch the Derma Dash platform, while instead favoring the development of competitive or unrelated telehealth platforms.

63. Padron breached his fiduciary duty of loyalty when he diverted the initial capital provided by Plaintiffs to support his development of projects competitive (or unrelated to) the Derma Dash platform.

64. Padron breached his fiduciary duty of loyalty when he diverted the ongoing capital infusions provided by Battah to support his development of projects competitive with (or unrelated to) the Derma Dash platform.

65. Padron breached his fiduciary duty of loyalty when he diverted the initial capital contributions and/or Battah's ongoing capital contributions for his own use and benefit and to the detriment of Plaintiffs.

66. Padron breached his fiduciary duty of loyalty when he covertly developed a competitive telehealth platform, MD2Rx, while falsely representing his investment in the development of Derma Dash.

67. Plaintiffs have been damaged by Padron's breaches of his fiduciary duties.

**COUNT II – BREACH OF CONTRACT**

68. Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

69. Padron was party to the Operating Agreement of Derma Dash LLC, a true and correct copy of which is attached hereto as Exhibit 1.

70. The Operating Agreement required Padron, among other things, to "devote such time to the Company business as is reasonably necessary to manage and supervise the Company business and affairs in an efficient manner and to accomplish the purposes of the Company." (Exhibit 1 ¶ 10.6).

71. Padron breached the Operating Agreement because he did not devote such time to development of the Derma Dash platform as was reasonably necessary to manage and supervise the company and affairs in an efficient manner and to accomplish the purposes of the company. Instead, he engaged in evasive fast-talk, circular communication, and the pursuit of side projects, at least one of which is directly competitive to Derma Dash.

72. In signing the Operating Agreement, Padron further agreed that he would "not disclose, use or exploit any Confidential Information at any time unless: (a) the Company consents in writing to such use; or (b) a court of lawful jurisdiction directs otherwise." (Exhibit 1 ¶ 11.8).

73. The Operating Agreement defines Confidential Information as including, among other things, "certain trade secrets, know-how, customer and supplier lists, products, services…price and quote lists, websites, website designs…customer and supplier information…marketing plans or reports, policies, methods, processes, models, data, techniques…inventions, software and software plans and designs, ideas, concepts and any other proprietary information related to the business of the Company that the Company…regards as confidential…" (Exhibit 1 ¶ 11.8).

74. Padron breached the Operating Agreement by disclosing and/or exploiting Confidential Information in conjunction with his role in the development of MD2Rx.

75. Padron breached the Operating Agreement by disclosing and/or exploiting Confidential Information in conjunction with his role in the development of Chubby's.

76. In signing the Operating Agreement, Padron agreed that he would not (for a one year period following him ceasing to hold Membership Interests in Derma Dash LLC) "directly or indirectly, individually or as a shareholder, director or officer of any corporation, a partner of any partnership, an owner of any other entity or as an employee, agent, consultant, advisor or independent contractor of any Person: (a) sell any products or services to any customer or Prospective Customer which are competitive in any manner with the products or services which the Company may sell to such customers or prospective customers…or (b) engage in or contribute any knowledge to any work or activity that is competitive with the products or services that the Company is providing on the Interest Termination Date…" (Exhibit 1 ¶ 11.9).

77. Padron breached the Operating Agreement when he acted in a prohibited capacity for MD2Rx, a dermatological telehealth platform which is designed to directly compete and – to the extent either platform functions at all – does compete with Derma Dash.

78. In signing the Operating Agreement, Padron agreed that he would not (for a one year period following him ceasing to hold Membership Interests in Derma Dash LLC) "recruit, hire or contract with any employee or independent contractor of the Company…" (Exhibit 1 ¶ 11.10).

79. Padron breached the Operating Agreement by recruiting, hiring or contracting Renee Dougalas to further the development of MD2Rx.

80. Plaintiffs have been damaged by Padron's breaches.

81. Plaintiffs will suffer irreparable harm if Pardon is permitted to continue his unlawful development of the MD2Rx and/or Chubby's platforms through the exploitation of Confidential Information, in violation of the parties' Operating Agreement.

## COUNT III – FRAUDULENT INDUCEMENT

82. Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

83. Padron's initial pitch of the Derma Dash concept to Battah and the co-investors, including his representations that the platform and concept were already well-developed, and that the website was approximately 3 months from a functional launch, was a false representation.

84. Padron knew his representations to secure Battah and the co-investors' initial capital contributions were false.

85. Padron's false representations in pitching the Derma Dash concept were done with the intent to induce Battah and the co-investors to contribute initial capital to the project.

86. Plaintiffs reasonably relied on Padron's representations.

87. Plaintiffs suffered damages in the minimum amount of their initial capital contribution (totaling approximately $118,000) as a result of Padron's false representations.

88. After obtaining the initial investments of Battah and the co-investors, Padron continued to make false representations regarding the status and anticipated progress of the platform's development, the timing of its launch, and the costs of ongoing development. These false representations spanned at least August 2019 through March 2020.

89. Padron knew his representations regarding the status and anticipated progress of the platform's development, the timing of its launch, and the costs needed for ongoing development were false.

90. Padron falsely represented the status and anticipated progress of the platform's development, the timing of its launch, and the costs needed for ongoing development in order to induce Battah to make additional capital contributions and to keep his sham project afloat.

91. Plaintiffs reasonably relied on Padron's ongoing false representations spanning August 2019 through March 2020.

92. Plaintiffs have been damaged by Padron's false representations in the minimum amount of their additional capital contributions (totaling approximately $307,000) as a result of Padron's false representations.

## COUNT IV – CONSTRUCTIVE TRUST

93. Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

94. Defendant owed Plaintiffs fiduciary duties as set forth above.

95. Defendant also promised to keep Confidential Information, as described above (including, but not limited to, "websites, website designs…processes, models, data, techniques…inventions, software and software plans and designs, ideas, concepts and any other proprietary information related to the business" of Derma Dash), confidential, and to refrain from exploiting such information.

96. Defendant was thus in both a fiduciary and confidential relationship with Plaintiffs.

97. Defendant has unlawfully retained exclusive access to the back-end of Derma Dash's platform and has thus transferred the intellectual property associated with the Derma Dash platform to his exclusive dominion.

98. Upon information and belief, Defendant has also unlawfully transferred Derma Dash's Confidential Information for his own benefit in the pursuit of the MD2Rx and/or Chubby's platform(s).

99. Upon information and belief, Defendant has misappropriated either the initial capital contribution made by Plaintiffs, the ongoing capital infusions provided by Battah, or both, for his personal enrichment beyond whatever sums were designated for his salary.

100. Defendant has been unjustly enriched by his transfer, misappropriation, and or/retention of these funds and intellectual property.

101. Defendant's conduct is fraudulent and unconscionable.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor as follows:

A) Awarding Plaintiffs money damages in an amount exceeding $75,000, to be proven at trial;

B) Entering a preliminary and permanent injunction against Padron enjoining him from pursuing telehealth systems or other business pursuits for which he has or intends to use the Confidential Information of Derma Dash LLC;

C) Entering a preliminary and permanent injunction against Padron enjoining him from engaging in competition and/or solicitation as prohibited by the Operating Agreement;

D) Imposing a Constructive Trust on all telehealth platforms for which Defendant used Confidential Information in breach of the Operating Agreement between the parties;

E) Requiring Defendant to provide Plaintiffs with an Accounting of his use of capital funds;

F) Attorney's fees and costs of suit as permitted by law;

G) Awarding Plaintiffs any other further relief this Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues presented in the Complaint so triable.

Dated: December 18, 2020

Respectfully submitted,

By: */s/ David G. Henry, Sr.*
David G. Henry, Sr. – Lead Counsel
State Bar No. 09479355
DHenry@GrayReed.com
**GRAY REED & MCGRAW LLP**
900 Washington Avenue, Suite 800
Waco, Texas 76701
Telephone: (254) 342-3000
Facsimile: (254) 342-3100

**ATTORNEY FOR PLAINTIFFS FRED BATTAH, MICHAEL BATTAH, AND SHALIMAR MAAKAR**